# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-1630

ROBERT SEPULVADO LOGGING, INC., ET AL.

VERSUS

JULIUS SEPULVADO

************

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 2,
PARISH OF RAPIDES, NO. 04-06032,
JAMES BRADDOCK, WORKERS' COMPENSATION JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Michael G. Sullivan, Judges.

## AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.

William P. Crews, Jr.
Attorney at Law
Post Office Box 226
Natchitoches, Louisiana 71458-0226
(318) 356-8001
Counsel for Defendant/Appellee:
    Julius Sepulvado

William A. Jones, Jr.
Attorney at Law
Post Office Box 636
Ruston, Louisiana 71270
(318) 254-8200
Counsel for Plaintiffs/Appellants:
    Robert Sepulvado Logging, Inc.
    American Interstate Insurance Company

SULLIVAN, Judge.

Robert Sepulvado Logging, Inc. (Sepulvado Logging) and American Interstate Insurance Company (American Interstate) appeal an award of supplemental earnings benefits (SEB), penalties, and attorney fees in favor of Julius Sepulvado. We affirm in part and reverse in part, as more fully explained below.

**Factual Background**

Mr. Sepulvado injured his right knee on December 7, 2001, while working as a "saw hand" or a "logger" for Sepulvado Logging. Dr. Lewis Jones, an orthopedic surgeon, performed arthroscopic surgery on February 21, 2002, to repair a torn medial meniscus cartilage. Mr. Sepulvado remained off work from the date of injury until May 13, 2002, after Dr. Jones had released him to light duty with the expectation that he would return to his former job within six weeks. Mr. Sepulvado's condition did not improve as expected, however; and after prescribing a series of Synvisc injections, Dr. Jones ordered a functional capacity examination (FCE) that was performed by occupational therapist Paul Procell on August 1, 2002. In that FCE report, Mr. Procell concluded that Mr. Sepulvado would not be able to return to his previous job of a "logger," which was classified as heavy duty employment, but that he could perform medium duty work, which was defined as lifting and handling fifty pounds occasionally, twenty pounds frequently; squatting and climbing on an occasional basis; and avoiding continuous standing/walking greater than two hours. At the time of the FCE, Mr. Sepulvado had begun operating a skidder for the same employer, a position that Mr. Procell found to be within these restrictions. On August 8, 2002, Dr. Jones released Mr. Sepulvado from his care, agreeing with the FCE that he was permanently restricted from working as a logger, but that he could continue working at medium level. While working both at light duty and then at

medium duty as a skidder operator, Mr. Sepulvado was paid the same salary he earned at his heavy duty position of a saw hand or logger.

On November 14, 2002, Mr. Sepulvado was examined by Dr. Austin Gleason, who assigned him a seven percent disability of the affected extremity, which translated to a three-percent total body impairment.

On January 27, 2003, Mr. Sepulvado returned to Dr. Jones, complaining of more pain in his right knee and more difficulty while operating a larger machine. Dr. Jones diagnosed tendinitis of the medial collateral ligament, for which he recommended an injection, Medrol Dosepak, Bextra, and Darvocet. Sometime in April of 2003, Mr. Sepulvado quit his job as a skidder operator, complaining that his knee hurt too much for him to continue working.

On April 28, 2003, Mr. Sepulvado was examined for a second opinion by Dr. Gordon Mead, an orthopedic surgeon, who stated that he was unable to find objective evidence to support the level of pain reported. Dr. Mead reviewed pictures of the logging equipment and concluded that Mr. Sepulvado should be able to climb in and out of the skidder four or five times a day, which was reported as a job requirement. He also would have expected to have seen some atrophy in the right thigh as the result of a significant knee problem, but his examination revealed that both thighs were equal in circumference. Dr. Mead agreed with the FCE and with Dr. Gleason's permanent impairment rating.

On July 9, 2003, Mr. Sepulvado returned to Dr. Jones, who again prescribed an injection, as well as two weeks of physical therapy. On a return visit of July 23, 2003, Dr. Jones ordered that physical therapy be continued for an additional three weeks and for the first time suggested that Mr. Sepulvado consider retraining for a

different vocation. When an MRI of October 1, 2003 appeared normal, Dr. Jones sought another opinion from Dr. David Waddell of the same office. Dr. Waddell recommended a bone scan and then pain management, should the bone scan have negative results. When the bone scan came back essentially negative, Dr. Jones did not order pain management, but instead prescribed 800 mg of Ibuprofen twice a day and recommended that Mr. Jones wear his knee cage when he is having a "bad day" or is walking on unlevel ground.

In December of 2003, Mr. Sepulvado was still reporting to Dr. Jones that he could not get into the skidder because of its height and because it "shakes him too much." Dr. Jones then ordered another FCE from Mr. Procell, which was performed on January 6, 2004. In this report, Mr. Procell concluded that Mr. Sepulvado's "work capacities demonstrated today are also less when compared to his previous [FCE] completed 8/01/2002." Mr. Procell found that Mr. Sepulvado could perform at the light-medium work level, which he defined as lifting thirty-five pounds occasionally, fifteen pounds frequently; squatting and climbing occasionally; and avoiding continuous standing/walking greater than one hour and no greater than four to six hours total in an eight-hour shift. After reviewing the FCE report on January 16, 2004, Dr. Jones found that Mr. Sepulvado was unable to work in the woods driving a skidder or any serious vibrating equipment.

In his deposition of January 11, 2005, Dr. Jones reversed his opinion that Mr. Sepulvado was unable to operate a skidder after he reviewed a twenty-nine minute summary of nine hours of video surveillance taken of Mr. Sepulvado in February and May of 2004. In the video, Mr. Sepulvado is seen climbing in and out of the back of a pickup truck while leading with his right leg and dancing with his

3

wife over several hours on two occasions. Dr. Jones considered some of the activities to be inconsistent with Mr. Sepulvado's complaints of pain, in particular dancing for more than thirty minutes. However, he also stated that he was unable to tell if Mr. Sepulvado was wearing his knee brace in the video and noted that at the time of the taping Mr. Sepulvado had been prescribed 800 mg of Ibuprofen twice a day. Dr. Jones stated that he did not believe Mr. Sepulvado was a malingerer or a fraud, but after reviewing the tape, he believed Mr. Sepulvado could go back to work operating a skidder.

Dr. Garland Miller, the general practitioner who had referred Mr. Sepulvado to Dr. Jones, did not believe the activities on the video were inconsistent with Mr. Sepulvado's complaints of pain. In particular, Dr. Miller noted that, throughout most of the video, Mr. Sepulvado had his legs extended without exerting direct pressure on the knees. He believed that a repetitive motion test with knee exercises, similar to an FCE, would more likely indicate his true capabilities. Based upon Mr. Sepulvado's documented lack of full flexion, Dr. Miller did not believe that Mr. Sepulvado could flex his knees at ninety degrees and step on skidder clutch.

At trial, Mr. Sepulvado offered the following observations about his activities on the video. He pointed out that during the first dancing episode, he and his wife were on the dance floor for a total of thirteen minutes over a two-hour period, dancing to three slow songs and two fast songs. As to the second evening of dancing, he noted that he and his wife danced a total of forty-one minutes over four hours. According to Mr. Sepulvado, they danced nine slow songs and four fast songs, with the longest time on the dance floor at one time being five minutes.

4

Mr. Sepulvado also testified that when he began complaining about his knee on the job, his boss, Robert Sepulvado, told him that he did not have anything else for him to do and for him to come back when he settled with the insurance company or when he got a full release from the doctor. Mr. Robert Sepulvado denied telling Mr. Sepulvado to come back to work after a settlement, but instead told him that he could come back "whenever he got where he could work." Mr. Robert Sepulvado further testified that he has since downsized his operations and that he no longer has a skidder position available.

**Procedural History**

Sepulvado Logging and American Interstate paid Mr. Sepulvado indemnity benefits from the date of his injury, December 7, 2001, until he went back to light duty work in May of 2002, but continued to pay medical expenses. They resumed indemnity benefits when Mr. Sepulvado quit his job operating a skidder in April of 2003, and they filed this disputed claim on August 19, 2004, seeking a determination that he had recovered from his injury so that he was able to earn at least ninety percent of his pre-injury wages. The employer and insurer discontinued benefits on April 15, 2005. Mr. Sepulvado filed a reconventional demand seeking payment of additional medical bills for treatment received from Dr. Miller and for fees charged by a vocational rehabilitation counselor that he hired. He also made a claim for a back injury allegedly related to his initial accident.

After a trial, the workers' compensation judge (WCJ) awarded Mr. Sepulvado SEB at a zero earnings rate from the date of termination, as well as penalties of $2,000.00 and attorney fees of $5,000.00, but denied any claims related to additional expenses and injuries. In oral reasons, the WCJ stated that Mr. Sepulvado clearly

5

suffered a permanent partial disability that prevented him from returning to his original job as a saw hand. The WCJ also found that the employer and insurer had not demonstrated that a suitable job existed within Mr. Sepulvado's physical capabilities, particularly in light of the employer's testimony that he has downsized and no longer has a skidder job available.

On appeal, Sepulvado Logging and American Interstate argue that the WCJ erred in finding that Mr. Sepulvado proved he was unable to earn ninety percent of his pre-injury wages, in finding that the employer failed to demonstrate job availability, and in awarding penalties and attorney fees. Mr. Sepulvado has answered the appeal, seeking the medical and vocational rehabilitation expenses that the WCJ denied and additional attorney fees for work performed on appeal.

### Supplemental Earnings Benefits

In *Banks v. Industrial Roofing & Sheet Metal Works, Inc.*, 96-2840, pp. 8-9 (La. 7/1/97), 696 So.2d 551, 556, the supreme court discussed the purpose of SEB and set forth each party's burden of proof in an SEB claim as follows:

> "The purpose of SEBs is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident." *Pinkins v. Cardinal Wholesale Supply, Inc.*, 619 So.2d 52, 55 (La.1993). An employee is entitled to receive supplemental earnings benefits (SEBs) if he sustains a work-related injury that results in his inability to earn ninety percent (90%) or more of his average pre-injury wage. LA.REV.STAT.ANN. § 23:1221(3)(a) (West Supp.1997). Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. *Freeman* [*v. Poulan/Weed Eater*], 93-1530 [(La.1/14/94)] at p. 7, 630 So.2d [733] at 739. "Th[is] analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers' compensation is to be liberally construed in favor of coverage." *Daigle v. Sherwin-Williams Co.*, 545 So.2d 1005, 1007 (La.1989).
>
> Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the employee's claim for SEBs or

6

establish the employee's earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. LA.REV.STAT.ANN. § 23:1221(3)(c)(i) (West Supp.1997); *Daigle*, 545 So.2d at 1009. Actual job placement is not required. *Romero v. Grey Wolf Drilling Co.*, 594 So.2d 1008, 1014-15 (La.App. 3d Cir.1992). The amount of SEBs is based upon the difference between the claimant's pre-injury average monthly wage and the claimant's proven post-injury monthly earning capacity. LA.REV.STAT.ANN. § 23:1221(3)(a) (West Supp.1997).

"Further, '[d]isability can be proven by medical and lay testimony' and the WCJ 'must weigh all the evidence, medical and lay, in order to determine if the claimant has met his burden of proof.'" *Bradley v. ConAgra Poultry Co.*, 03-23, p. 7 (La.App. 3 Cir. 4/30/03), 843 So.2d 1255, 1259 (quoting *Bolton v. Grant Parish Sch. Bd.*, 98-1430, p. 4 (La. 3/2/99), 730 So.2d 882, 885). "Thus, the issue of disability is a factual determination. Factual findings of a [WCJ] may not be disturbed by an appellate court unless the factual findings are manifestly erroneous or clearly wrong." *Hilts v. Wal-Mart Stores, Inc.*, 02-1440, p. 4 (La.App. 3 Cir. 4/2/03), 842 So.2d 465, 469, *writ denied*, 03-1258 (La. 9/5/03), 852 So.2d 1036 (quoting *Fritz v. Home Furniture-Lafayette*, 95-1705, p. 3 (La.App. 3 Cir. 7/24/96), 677 So.2d 1132, 1134 (citation omitted)).

The employer and insurer argue that, because Mr. Sepulvado voluntarily left a job within his physical capabilities that paid the same as his pre-accident wages, he cannot meet the initial burden of proving that he is unable to earn ninety percent of his former earnings. They further argue that the WCJ committed legal error warranting a *de novo* review by requiring them to prove job availability before the employee met his initial burden of proof. Mr. Sepulvado responds that the medical

7

and lay testimony shows that, rather than voluntarily leaving the job of operating a skidder, he quit for medical reasons.

The record reflects that Mr. Sepulvado is permanently disabled from his former heavy duty position of a saw hand or logger. As to his continued ability to perform the medium duty position offered by his employer, the record reflects that he reported pain and difficulty operating the skidder in January of 2003, which was approximately three months before he left that employment. His treating physician injected his knee at that time and placed him on anti-inflammatory and pain medications. After leaving his job in April, he continued to receive treatment through August of 2003, which included injections and physical therapy. In January of 2004, he underwent another FCE that documented a decrease in his work capabilities from the previous test of August 2002 and that resulted in a change in classification from medium duty to light-medium duty with more restrictions. During that time, two independent medical opinions were obtained: one physician could find no reason for his continued complaints of pain, whereas another recommended a pain management program that was never implemented. His treating physician agreed with the greater restrictions imposed by the most recent FCE and continued to prescribe anti-inflammatory and pain medications, as well as a knee cage. In addition to this medical evidence, the record reflects that Mr. Sepulvado's employer told him that he could return "whenever he got where he could work." The record also reflects that the skidder position is no longer available, as the employer testified that he has since downsized his operations.

Mr. Sepulvado's treating orthopedist, Dr. Jones, testified in January of 2005 that he believed Mr. Sepulvado could operate a skidder after viewing an abbreviated

version of video surveillance that began in February of 2004, approximately ten months after Mr. Sepulvado left his employment. Dr. Jones also testified that he was unable to tell if Mr. Sepulvado was wearing a knee brace while being videoed. Another treating physician, Dr. Miller, however, disagreed with Dr. Jones' opinion regarding the surveillance, stating that he believed work capacity would be more accurately measured by the repetitive exercises of an FCE.

After reviewing the totality of the evidence, under either a manifest error or *de novo* standard, we find that Mr. Sepulvado has proved his entitlement to SEB. The medical records compiled before and after Mr. Sepulvado left his job do not support the employer's contention that he left his job voluntarily. Those records document continued complaints, additional treatment, and a decreased work capacity. The video surveillance that Dr. Jones relied upon in reversing his opinion as to disability did not begin until ten months after Mr. Sepulvado left his job, and another treating physician did not believe that the surveillance was an accurate measure of whether Mr. Sepulvado could operate a skidder. Considering the permanent disability from his previous employment, as well as the downgraded restrictions to "light-medium" duty in the most recent FCE, we find that Mr. Sepulvado has demonstrated his inability to earn ninety percent of his pre-accident wages. We further find that the employer and insurer have not met their burden of proving job availability, even if Mr. Sepulvado were capable of operating a skidder as of January 2005, given the employer's testimony that such a job is no longer available. Accordingly, the award of SEB at a zero earnings base is affirmed.

9

**Penalties and Attorney Fees**

The employer and insurer next argue that the WCJ erred in awarding penalties and attorney fees, given their reliance on Mr. Sepulvado's treating physician's opinion. We agree.

Because this case involves a discontinuance of benefits, the standard by which the employer or insurer's conduct is judged is found in La.R.S. 23:1201(I). Under that statute, an employer or insurer who discontinues payment shall be subject to penalties and attorney fees "when such discontinuance is found to be arbitrary, capricious, or without probable cause." In *Brown v. Texas-LaCartage, Inc.*, 98-1063, pp. 8-9 (La. 12/1/98), 721 So.2d 885, 890, the supreme court explained:

> Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation. BLACK'S LAW DICTIONARY 104, 211 (6th ed.1990). Stated another way, such behavior arises from unrestrained exercise of the will or personal preference or lacks a predictable pattern. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 110, 333 (1966).[1]

Further, the arbitrary and capricious standard requires conduct that is more egregious than that required by La.R.S. 23:1201(F), which imposes penalties and attorney fees when the employer or insurer fails to timely pay a claim that is not "reasonably controverted." *Brown*, 721 So.2d 885.

In the present case, the employer and insurer relied upon the opinion of the claimant's treating physician that he could perform a job that was at one time available to him. Although both the WCJ and this court found that opinion not to be determinative in light of the other medical and lay evidence in the record, we cannot

---

[1]In *Brown*, 721 So.2d at 890, the supreme court was discussing language then found at La.R.S. 23:1201.2. Louisiana Revised Statutes 23:1201.2 was repealed by 2003 La. Acts No. 1204, § 2, and its substance is now found at La.R.S. 23:1201(I).

10

say that the termination of benefits was arbitrary and capricious, given the history of this claim. Accordingly, the award of penalties and attorney fees is reversed, and Mr. Sepulvado's claim for additional attorney fees on appeal is denied.

**Answer to Appeal**

In his answer to the appeal, Mr. Sepulvado argues that the WCJ erred in denying his claim for additional medical expenses of Dr. Miller and the fees of a vocational rehabilitation counselor that he hired. We find no error in the denial of either claim. Although this court recognized in *Batiste v. Capitol Home Health*, 96-799 (La.App. 3 Cir. 5/7/97), 699 So.2d 395, that an employer is not the only entity that may *select* a vocational rehabilitation counselor, that case arose in the context where the WCJ accepted a particular counselor suggested by the employee. Significantly, the employee in that case sought authorization from the WCJ before hiring the counselor. In the present case, it appears that the employee "independently, without any authority, procured an additional counselor," a procedure that we did not allow in *J.E. Merit Constructors, Inc. v. Hickman*, 99-1389, p. 6 (La.App. 3 Cir. 3/1/00), 758 So.2d 320, 325, *rev'd in part on other grounds*, 00-943 (La. 1/17/01), 776 So.2d 435. As to Dr. Miller's expenses, the record reflects that Mr. Sepulvado admittedly sought treatment from Dr. Miller for his additional problems of diabetes and hypertension. We find no error in the denial of these claims.

**Decree**

For the above reasons, the judgment of the Office of Workers' Compensation is reversed insofar as it awards Julius Sepulvado penalties and attorney fees. In all other respects, the judgment is affirmed. Costs of this appeal are assessed one-half

11

to Robert Sepulvado Logging, Inc. and American Interstate Insurance Company and one-half to Julius Sepulvado.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**